# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

**YESENIA RIVERA,**
    Plaintiff,

v.     CASE NO.:

**THE CSI COMPANIES, INC.,**
    Defendant.

_____

## COMPLAINT
(Demand for Jury Trial)

Yesenia Rivera, by counsel, sues the The CSI Companies, Inc. for violation of Title VII of the Civil Rights Act of 1991 and the Florida Civil Rights Act of 1992, as amended. For her Complaint, Plaintiff alleges:

### PARTIES

1. Plaintiff, Yesenia Rivera ("Rivera"), is a citizen of the United States, a resident of Hillsborough County, Florida, and over the age of eighteen (18) years. At all times pertinent, Plaintiff was an "employee" of the Defendant as defined by the Florida Civil Rights Act of 1992, as amended.

2. Defendant, The CSI Companies, Inc. ("CSI"), is a corporation under the laws of the State of Florida, with headquarters in Duval County, Florida.

3. At all times pertinent, CSI is an "employer" as defined by the Florida Civil Rights Act of 1992, as amended.

## JURISDICTION AND VENUE

4. This is an action arising under Title VII of the Florida Civil Rights Act of 1991 ("Title VII") and the Florida Civil Rights Act of 1992, as amended ("FCRA").

5. The cause of action accrued in Polk County, Florida. Hence, venue is proper in this district and this division.

## CONDITIONS PRECEDENT

6. Plaintiff filed her individual charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around September 19, 2023.

7. The EEOC issued a right to sue on March 17, 2024 and this suit is brought within ninety (90) days of her receipt of the notice and thus, this case is filed within the timeframe set forth in the right to sue.

## GENERAL ALLEGATIONS

8. Plaintiff was initially employed by CSI as Physician Support in early March, 2022 and was assigned to the PCU and intensive care units at AdventHealth Heart of Florida in Davenport, Florida preparing the hospital for activation.

9. CSI, among other things, provides consultants to hospitals. On its website, it ironically claims that:

> "Working with CSI is unlike anything you're likely to experience in your professional career. Whether you work as a consultant or member of our internal team, you'll quickly learn why we were named one of North

Florida's "Best Places to Work". We're passionate about our work, and our physical, emotional & professional well-being. Put one foot on our new campus and see for yourself."

10. Throughout Plaintiff's employment with the Defendant she was never written up, offered counseling, or reprimanded concerning any performance and/or behavioral concern.

*ALLEGATIONS REGARDING THE SEXUALLY HOSTILE ENVIRONMENT*

11. Two to three weeks into her employment with CSI, Rivera, while working on the patient unit on the third floor, began to receive unwarranted and unwelcome sexual advances from a floater named Michael Brown ("Brown") who was assigned to provide assistance to any one who needed help.

12. Sometime around mid-to-end March, 2022, Brown entered the patient unit and told Rivera that someone called for assistance.

13. Rivera stated that it was not her who requested assistance but that it may have been someone in ICU.

14. Since the path to ICU was complicated, Rivera offered to escort Brown back.

15. During the walk back to ICU, Brown told Rivera that the CSI Team Leads sleep with females and promises them additional hours if they will sleep with them.

16. Rivera objected to Brown that such behavior was disgusting and rhetorically asked why anyone would do that.

17. The following day, Brown returned and continued on to ICU on his own as he now knew his way.

18. Later, Rivera received a phone call from a provider in ICU requesting help with a computer, so Rivera went to ICU to provide the requested assistance.

19. When Rivera arrived, Brown quickly left the unit.

20. After Rivera had finished and was about to head back to her assigned unit, Melissa Douglas ("Douglas"), a coworker who called for assistance the previous day, and a couple of other co-workers said that they had something to tell her.

21. Once Brown was out of eyesight, Douglas informed Rivera that Brown had said "you know that new girl Yessie, I would like to lay her down on the bed and eat her pussy cause you can tell she has good sweet pussy".

22. Rivera, absolutely disgusted and mortified, was asked by Douglas not to say anything to Brown because he would know that it was she who told Rivera. Rivera agreed and brushed it off thinking that Brown wouldn't be back as he was just a floater.

23. On Brown's way out the following day, he stopped by Rivera's unit while she was helping a physician and a couple of nurses.

24. Plaintiff overheard Brown while talking on his phone, "there's a new girl here and you have to see her. She has a cute face and a fat ass".

25. Rivera was offended and immediately turned around and demanded that Brown not speak of her that way.

26. From co-workers, Plaintiff next learned that Brown talked to male coworkers on the phone about her.

27. Several weeks later, employees were sent home except for about 5-7 people whose assignments were extended to remain at the hospital to continue support.

28. Those who were extended included Brown and Rivera who were assigned to support the entire hospital; Msugh Tuse known as Soup ("Soup"), Shavon ("Shavon") , Geff Lanuze ("Lanuze") and Team Lead Starr Goss ("Goss"),

29. One busy Wednesday, it was nearing 4:00 p.m. and Rivera had not yet been able to take a lunch break.

30. Rivera called Brown for coverage but was unable to reach him.

31. Since she could not get in touch with Brown, Rivera decided to go to the cafeteria to locate her Team Lead.

32. As Rivera approached the Command Center located within the hospitals cafeteria, she noticed Brown and Soup inside but they appeared to be exiting and were blocking the doorway.

33. Rivera asked Brown if he had received her calls but he ignored her.

34. While still blocking the entrance, Brown placed his arm on Soup's shoulder and said, "Lemme tell you something about girls. I don't know why girls get offended when you tell them they have a cute face and fat ass".

35. Rivera immediately felt threatened, particularly as she noticed that the two men were inching closer towards her.

36. In fear of her safety, she slipped out of the door to escape, raising her voice for others to hear, and saying, "don't talk about me like this".

37. Nonetheless, Brown and Soup continued to advance towards her as Soup says, "guys mature slower than girls, he's just being immature. You know I was gonna shoot my shot but now that I see that you're so aggressive I'm not".

38. Still in fear of her safety, Rivera said she was going to call her brother to which Soup responded, "why would you get your brother if your doing a good job of taking care of yourself right now".

39. Rivera was able to escape, continued unsuccessfully looking for Goss only to find that she was not at work that day.

40. Lanuze was in the command center covering for Goss and apologized to Rivera the following day about the incident he witnessed between Rivera, Brown, and Soup.

41. Rivera said, "wow, two guys against one girl. Why did you not help me?" Lanuze replied, "I knew you would handle them because you from the Bronx New York."

*ALLEGATIONS REGARDING LOCAL MANAGEMENT*

42. The next day, Rivera notices Goss seated with Shavon and Soup at the Starbucks located within the hospital. Seemingly upset with Rivera, Goss and Shavon tell her that they heard about what happened the previous day but Soup said Rivera caused the scene.

43. Rivera begins to tell Shavon the story but is cut off and offered the following advice: "If you wanna continue to work for CSI, the best thing to do is keep your mouth shut. Once you hit 3-5 years, this will go away - the guys won't bother you because you'll be a non new person."

44. Rivera was told by her manager, Goss, that she should not have caused a scene.

45. She also said to Rivera that since Brown and Soup have been with CSI for many years, the company would always believe them and not someone so new.

46. Goss told Rivera that if she found Brown attractive, she wouldn't mind the unwarranted sexual comments that he had been making against her.

47. Rivera replied, "If a women got raped by an attractive guy, then is it not rape? Then is it ok??? How disgusting is that and coming from a women very ignorant."

48. The following day CSI sent out a mass e-mail reflecting the company's policy on sexual harassment and harassment in the workplace.

49. After the company wide e-mail was sent out, Goss, Shavon, and Soup accused Rivera of contacting CSI.

50. They said, "this will get bad, just wait and see".

51. Soup and Shavon repeated that if Brown was a good looking guy then Rivera would not mind him talking to her and about her.

52. Rivera told them that it was not her because she did not even know CSI HR department as she was new to the company and did not previously have that information.

*REPORTING TO CORPORATE HUMAN RESOURCES*

53. Assuming the company email was related to her situation with Brown, Rivera contacted Alicia Clough ("Clough"), VP of HR, directly to discuss.

54. Clough told Rivera that the e-mail was sent out as a result of an unrelated matter and that they would speak about her situation the following Monday.

55. A short while later, Soup, Shavon, and Goss approached Rivera to ask why she reported Brown.

56. On Monday, Rivera met with Clough and informed her of the harassment she had been exposed to by Brown and provided her with video footage she recorded during the incident at the Command Center.

57. As far as Plaintiff knew at that time Human Resources did not investigate her complaint and took no disciplinary action against Brown, Soup, or Goss. Later she learned that HR asserted that it had disciplined Brown by prohibiting him from working on the same assignment with Rivera. However, as set forth herein, Brown continued to be assigned work with her. No others were "disciplined."

*THE BEGINNING OF THE END*

58. The following Friday Rivera was transferred to North Carolina for two weeks, then to Georgia for another assignment.

59. While in Georgia, Rivera finds that Brown has also been assigned to this project.

60. Rivera immediately met with her new Team Lead, Sam ("Sam"), and told him about the past incidents she had with Brown and asked to be separated from Brown.

61. Sam told Rivera that he would have terminated Brown's employment immediately and directed her to contact the recruiter who presented her with the opportunity at CSI and outline what has happened to her.

62. Rivera did as Sam instructed her to do.

63. However, when Rivera's complaints to the recruiter got back to HR, Clough professed ignorance and asserted that she had never been informed of the incidents in spite of meeting with Plaintiff and receiving a video.

64. Clough did no investigation after her communication with Plaintiff's recruiter.

*GEORGIA-THE END*

65. While still on assignment in Georgia, Sam did a great job at separating Brown and Rivera so that no further incidents occurred.

66. Around this time, Rivera started to receive naked pictures of men - most were just of the genital area but one of those photographs included a mans face that she was able to recognize as David Dar ("Dar").

67. Six years before for a few days, Rivera had been Dar's Team Lead with another employer.

68. Dar is a friend of Brown.

69. Rivera went to HR to file a complaint about the unsolicited and sexual photographs she received.

70. Rivera was told by HR that disciplinary action had been taken against Brown for the comments he made to Douglas, but that they were unable to locate Dar.

71. Rivera was told that Brown would no longer work with her, but in December, 2022, they gave Brown the same assignment as her.

72. Rivera informed her Team Lead, Melissa Brown ("Melissa") that she and Brown were not supposed to be on the same assignment.

73. Rather than checking with HR, Melissa simply stated that while they were aware of the situation, they did not wish to be involved. More specifically saying, "that is not my problem".

74. Rivera was forced to continue working with Brown in spite of the alleged disciplinary action.

75. Rivera then reached out to Clough once more to ask why she was still being put on the same assignments as Brown.

76. Clough remarked that it seemed like that was done on purpose.

77. After that assignment concluded on January 2, 2023, Rivera was hand-picked by a higher-up from the hospital and assigned to another project and began getting phone calls from unknown women calling her offensive names and threatening bodily harm.

78. Plaintiff was by herself and covering three (3) separate hospitals.

79. Once again, Rivera informed Clough - the same person who had been handling the case - of the threatening calls she was receiving.

80. Clough advised Rivera to contact the police and so she did.

81. Since Rivera did not have these individuals saved in her phone, the police requested that she ask the company if they worked with her.

82. Rivera was also informed that Brown's wife/girlfriend worked for CSI and Rivera reported this to Clough as well.

83. Clough confirmed that she was able to identify one of the callers but could not tell Rivera because that the person is "important to CSI".

84. Even after Rivera presented evidence of the incident, Clough told Plaintiff that the voicemail could have been left by someone who stole the owner's phone and said "I am not the police".

85. Clough, the Human Resources representative, told Rivera how difficult it will be for her moving forward in the company because she had reported Brown for sexual harassment.

86. Rivera's employment was terminated via telephone at 8:00 p.m. on Sunday, March 19, 2023.

87. Plaintiff's termination occurred shortly after Clough had told her that reporting in Brown would make it difficult for her to continue working at CSI.

**COUNT I**
Sex Discrimination under Title VII of the Civil Rights Act of 1991

88. Plaintiff re-alleges ¶¶1-87.

89. CSI discriminated against Rivera on account of her sex in violation of Title VII of the Civil Rights Act of 1991.

90. As a direct and proximate result of CSI's unlawful and discriminatory acts, Rivera was caused to suffer loss of earnings, loss of earning capacity, loss of enjoyment of life, injury to reputation, and severe emotional distress.

91. Rivera has hired counsel and is obligated to compensate them for their services.

WHEREFORE, Plaintiff seeks the following relief:

(a) Declare Defendant's conduct to be violations of Plaintiff's rights under Title VII of the Civil Rights Act of 1991;

(b) Award restitution damages to loss of earnings for all lost wages including merit increases, loss of promotional opportunity, benefits, and other remuneration;

(c) Award compensatory damages to Plaintiff for her pain and suffering;

(d) Award Plaintiff punitive damages as punishment for Defendant's willful violations of Title VII of the Civil Rights Act of 1991 and as a deterrent to others;

(e) Award Plaintiff her costs and attorneys' fees;

(f) Award Plaintiff pre-judgment and post-judgment interest as permitted by applicable law; and

(g) Grant such other and further relief as may be deemed just and proper.

## COUNT II
Retaliation under Title VII of the Civil Rights Act of 1991

92. Plaintiff re-alleges ¶¶ 1-87.

93. CSI retaliated against Rivera in violation of Title VII of the Civil Rights Act of 1991 by terminating her employment after she repeatedly complained of sexual harassment, which was protected conduct.

94. As a direct and proximate result of CSI's unlawful and retaliatory acts, Rivera was caused to suffer loss of earnings, loss of earning capacity, loss of enjoyment of life, injury to reputation, and severe emotional distress.

95. Rivera has hired counsel and is obligated to compensate them for their services.

WHEREFORE, Plaintiff seeks the following relief:

(a) Declare Defendant's conduct to be violations of Plaintiff's rights under Title VII of the Civil Rights Act of 1991;

(b) Award restitution damages to loss of earnings for all lost wages including merit increases, loss of promotional opportunity, benefits, and other remuneration;

(c) Award compensatory damages to Plaintiff for her pain and suffering;

(d) Award Plaintiff punitive damages as punishment for Defendant's willful violations of Title VII of the Civil Rights Act of 1991 and as a deterrent to others;

(e) Award Plaintiff her costs and attorneys' fees;

(f) Award Plaintiff pre-judgment and post-judgment interest as permitted by applicable law; and

(g) Grant such other and further relief as may be deemed just and proper.

**COUNT III**
Sex discrimination in violation of the Florida Civil Rights Act of 1992, as amended

96. Plaintiff re-alleges ¶¶ 1-87.

97. CSI discriminated against Rivera on account of her sex in violation of the Florida Civil Rights Act of 1992, as amended.

98. As a direct and proximate result of CSI's unlawful and discriminatory acts, Rivera was caused to suffer loss of earnings, loss of earning capacity, loss of enjoyment of life, injury to reputation, and severe emotional distress.

99. Rivera has hired counsel and is obligated to compensate them for their services.

WHEREFORE, Plaintiff seeks the following relief:

(a) Declare Defendant's conduct to be violations of Plaintiff's rights under the Florida Civil Rights Act of 1992, as amended;

(b) Award restitution damages to loss of earnings for all lost wages including merit increases, loss of promotional opportunity, benefits, and other remuneration;

(c) Award compensatory damages to Plaintiff for her pain and suffering;

(d) Award Plaintiff punitive damages as punishment for Defendant's willful violations of the Florida Civil Rights Act of 1992, as amended and as a deterrent to others;

(e) Award Plaintiff her costs and attorneys' fees;

(f) Award Plaintiff pre-judgment and post-judgment interest as permitted by applicable law; and

(g) Grant such other and further relief as may be deemed just and proper.

## COUNT VI
Retaliation in violation of the Florida Civil Rights Act of 1992, as amended

100. Plaintiff re-alleges ¶¶ 1-87.

101. CSI retaliated against Rivera in violation of Title VII of the Civil Rights Act of 1991 by terminating her employment after she complained repeatedly of sexual harassment.

102. As a direct and proximate result of CSI's unlawful and retaliatory acts, Rivera was caused to suffer loss of earnings, loss of earning capacity, loss of enjoyment of life, injury to reputation, and severe emotional distress.

103. Rivera has hired counsel and is obligated to compensate them for their services.

WHEREFORE, Plaintiff seeks the following relief:

(a) Declare Defendant's conduct to be violations of Plaintiff's rights under the Florida Civil Rights Act of 1992, as amended;

(b) Award restitution damages to loss of earnings for all lost wages including merit increases, loss of promotional opportunity, benefits, and other remuneration;

(c) Award compensatory damages to Plaintiff for her pain and suffering;

(d) Award Plaintiff punitive damages as punishment for Defendant's willful violations of the Florida Civil Rights Act of 1992, as amended and as a deterrent to others;

(e) Award Plaintiff her costs and attorneys' fees;

(f) Award Plaintiff pre-judgment and post-judgment interest as permitted by applicable law; and

(g) Grant such other and further relief as may be deemed just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands trial by jury of all issues so triable as a matter off of right

**DATED JUNE 14, 2024**  FOR PLAINTIFF:

BY: */s/ G. Ware Cornell, Jr.*
G. Ware Cornell, Jr.
Fla. Bar No.: 203920
ware@warecornell.com
**CORNELL & ASSOCIATES, P.A.**
2645 Executive Park Drive
Weston, Fla. 33331
Tel: (954) 618-1041